UNITED STATES of America, Plaintiff,

v.

One 1977 LINCOLN MARK V, SERIAL NO. 7Y89A832686, Defendant.

Nos. 78 Civ. 316–CLB.

United States District Court,
S. D. N. Y.

July 28, 1978.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, by Peter R. Paden, Asst. U. S. Atty., New York City, for plaintiff.

Hermena Perlmutter, David Van Muraskin, Perlmutter & Muraskin, New York City, for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This action was tried to the Court on June 29, 1978. The Government seized and seeks forfeiture, pursuant to § 511(a) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 881(a), of a Lincoln Mark V automobile, defendant in this *in rem* proceeding. That statute provides:

"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

&ast; &ast; &ast; &ast; &ast; &ast;

(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [contraband]."

The claimant in this proceeding, and registered owner of the Lincoln Mark V is Rudy Ford, a/k/a Rudy Powell, Robert Rudy Ford, John Arnold Powell, Rudolph John Arnold Powell, Rudolph Powell, and "Butch."

Ford was tried and acquitted on April 6, 1978 by a jury in this District, on charges of distributing and possessing heroin and 'of aiding and abetting the sale of heroin [77 Cr. 863-CMM]. A conspiracy charge against Ford was dismissed by the Court and, therefore, not submitted to the jury. This forfeiture arises out of the same events on which Ford's indictment was based. The judgment of acquittal thus does not preclude the Government at this trial, as is explained *infra,* p. 1391.

The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1345 and 1355.

At all relevant times, the 1977 Lincoln Mark V, Serial No. 7Y89A832686 was owned by the claimant, Rudy Ford. On August 22, 1977, Alfredo Iglesias, Special Agent in the Drug Enforcement Administration (hereinafter "the DEA"), acting in an undercover capacity, met Jack Bell at a Holiday Inn and asked him to sell Iglesias ⅛ kilogram of heroin. Bell said that he didn't have that much, but that he could get it in a few days from "his people" who were currently "sold out." Bell showed Iglesias "some" heroin at that first meeting. Iglesias and Bell next met on August 25th at approximately 12:30 or 1:00 P.M. in Bell's room at the President Hotel on West 48th Street, after Iglesias had telephoned Bell earlier the same day to ask Bell to arrange a sale of heroin. In the hotel room, Bell showed Iglesias a sample of heroin and made several telephone calls in an attempt to locate the person who was to deliver the heroin. After about an hour of negotiations at the hotel room, the illicit transaction was postponed to the next day, August 26th.

The second meeting between Bell and Iglesias on August 26, 1977 took place around 5:30 P.M. when Iglesias called for Bell at the President Hotel and drove to 121st Street and Lexington Avenue in Iglesias' unmarked government car. At 122nd Street and Lexington Avenue, Bell pointed to a green Lincoln Mark V automobile parked slightly north of the northeast corner of 121st and Lexington, and across the street from an apartment building at 1990 Lexington Avenue. Bell said that the Lin-

coln belonged to his "man from the Bronx." The Court admitted the statements of Bell, otherwise hearsay, pursuant to Rule 801(d)(2)(E), F.R.Evid. Bell directed Iglesias to park in the middle of the block on the north side of 121st Street between Lexington and Park Avenues. Meanwhile, Agent Salvatore was parked on 120th Street between Lexington and Park and observed Bell and Iglesias arrive and park on 121st Street. Salvatore had an unobstructed view of Iglesias' government car. At the same time, Agent Nolan was parked on the northeast corner of 122nd Street and Lexington Avenue. He saw Bell and Iglesias drive down Lexington Avenue and turn right onto 121st Street.

Before Nolan took up his surveillance station, he surveyed the area, observed the green Lincoln parked across the street from 1990 Lexington Avenue and noted its license number. He made a radio communication and ascertained the name and address of the registered owner of the Lincoln.

Back in Iglesias' car, Iglesias had refused to front Bell the money to purchase the heroin, insisting that the sale take place in the car. Faced with this refusal, and in response to it, Bell left the car, saying that he didn't know if "his people" would do a deal that way. Salvatore then saw Bell walk up Lexington Avenue; and Nolan saw Bell enter the building at 1990 Lexington, and leave that building about 30 minutes later with two other men, one of whom was Mr. Ford, claimant in this action. Bell, Ford and the third man approached the Iglesias car, Bell re-entering the car, while Ford and his companion remained outside, under circumstances warranting the inference that they were acting as lookouts. Bell removed the heroin from within the zipper area of his pants. After testing the heroin, Iglesias got out of the car, removed the customary brown paper bag of the sort used to carry money and narcotics in such transactions from the trunk, and re-entered the government car where he paid Bell $7,000.00 in pre-marked bills. Bell then left the car, and Salvatore saw Bell give "a quantity of money" to Rudy Ford. Iglesias also saw Bell hand something to Rudy Ford. Bell re-entered the Iglesias car, and Iglesias and Bell drove away together.

Salvatore watched Rudy Ford go to an outdoor telephone booth, where Ford's back was turned to Salvatore. Ford and his companion then walked up Lexington Avenue, out of Salvatore's sight. Salvatore received a radio communication and shortly thereafter followed the green Lincoln to a traffic light at 121st or 122nd Street and Third Avenue where the agent pulled abreast of the Lincoln. He saw Rudy Ford and his male companion, and a female in the car. When the light turned green, Salvatore stopped following the Lincoln. Nolan watched Ford and his companion walk up Lexington Avenue and get into "a car." When, immediately thereafter, the green Lincoln pulled out of its parking space, Nolan followed it on a somewhat circuitous route through the Bronx until he lost the Lincoln near the 231st Street exit on the Major Deegan Expressway. Nolan identified the driver of the Lincoln as Rudy Ford. At the beginning of the trip, Ford let his two companions out of the car at 123rd or 124th Street and Adam Clayton Powell Boulevard. After some searching for the Lincoln, Nolan radioed for the address of the registered owner of the Lincoln. He received the address and went to 20 West Mosholu Parkway where he spotted the Lincoln in the outdoor parking lot of a large apartment complex.

Agent Iglesias met with Bell once more on September 14, 1977, after Iglesias had telephoned Bell to arrange another sale. There was another meeting at Bell's hotel and later that same day Bell and Iglesias drove to 124th Street and Madison where Bell went into a bar. He came out, they drove north a few blocks, and Iglesias stopped again so that Bell could make a telephone call. Bell told Iglesias that they were looking for the same people they had

dealt with on August 26th, "the man that owned that green Lincoln." No sale was made on September 14th.

It is clear from the foregoing, and I find, that Jack Bell did not have enough heroin on his person to make a sale to Iglesias before he met Rudy Ford on August 26th. The amounts of heroin Bell possessed prior to connecting with Ford were small quantities intended only as samples for the prospective heroin purchaser. The sale was consummated only after Bell met Ford. Since Ford *drove away from* the sale area to his home, and since it is not disputed that Ford owned the Lincoln car, it can be inferred that Ford also drove in the Lincoln *to* the place of the heroin sale. Clearly, Ford also acted as a lookout while the heroin and money was transferred between Bell and Iglesias. Ford received money from Bell immediately after Iglesias paid Bell.

Rudy Ford did not testify at the forfeiture proceeding, and called no witnesses. The only rebuttal to the Government's case was an unsuccessful attempt to impeach the credibility of the DEA Agents, and a suggestion that Bell had heroin on his person before he connected with Ford on August 26th. The Court finds the Agents' testimony credible.

■ Collateral estoppel, arising out of Rudy Ford's acquittal in the prior narcotics trial is not available in this subsequent civil proceeding because the standards, and also the burdens of proof, are different. At Ford's criminal trial, proof of all elements of the crime[s] charged beyond a reasonable doubt was required, and the burden to do so was on the Government. In this forfeiture proceeding, however, the Government need only establish by a preponderance of the credible evidence that there was probable cause to seize the vehicle, and, therefore, to institute the forfeiture suit. 21 U.S.C. § 881(d); 19 U.S.C. § 1615; *United States v. One 1975 Mercury Monarch, Serial No. 5E35L539729,* 423 F.Supp. 1026, 1028 (S.D. N.Y.1976).

■ Knowing, intentional participation by Ford and the participation of his Lincoln Mark V in a heroin sale were each established by a preponderance of the credible evidence in this civil trial. As soon as the Government has met its burden of establishing probable cause, the burden of going forward shifts to require the claimant to establish that his vehicle is not subject to forfeiture. *Mercury Monarch, supra,* at 1028. See also, 21 U.S.C. § 885(a), which provides that the person claiming the benefit of any exception or exemption from the control and enforcement provisions, §§ 801–904, of the Comprehensive Drug Abuse Prevention and Control Act of 1970 has the burden of going forward with evidence establishing the basis for any such exception or exemption. This claimant has not done so. Defendant does not assert that the vehicle was in the unlawful possession of a person other than the owner. 21 U.S.C. § 881(a)(4). He merely denies that the Government's evidence shows that the vehicle was used to facilitate a heroin transaction.

The case of *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421 (2d Cir. 1977), defines the issue: Was there a "sufficient nexus" between the use of the Lincoln to transport Mr. Ford to the August 26th sale with the heroin, and from the sale carrying the proceeds of that sale, so as to amount to a facilitation *in any manner* of that sale within the meaning of § 881(a)(4)? See, *1974 Cadillac Eldorado, supra* at 423. Such a nexus is present in this case, and the question is answered in the affirmative.

Cases cited by claimant in which forfeiture of an automobile was denied are all factually distinguishable. In *United States v. One 1974 Cadillac Eldorado,* 575 F.2d 344 (2d Cir. 1978), the evidence compelled the conclusion that claimant possessed heroin *before* the pink Cadillac ever entered the picture. There was no basis for a conclusion that the heroin had ever been transported in the pink Cadillac. The driver of the Cadillac apparently did not act as look-

out, or as a transporter of the sale proceeds. In this case, no sale was consummated until Rudy Ford and the Lincoln arrived at the scene. In *United States v. One Buick Riviera,* 374 F.Supp. 277 (D.Minn.1973), claimant owner drove another person to an airport in Minnesota and, at the airport, gave that individual money to buy heroin in Mexico. The purchase was made in Mexico. That case is vastly different in "distance, time, [and] circumstance" from this one. *Buick Riviera, supra* at 280.

In *United States v. One 1972 Datsun,* 378 F.Supp. 1200 (D.N.H.1974), the court denied a forfeiture where a seller of illegal drugs used a car on two occasions to lead a DEA agent to the place of sale. In this Circuit, however, it is established that use of a vehicle to "transport the *peddler or his confederates* to the scene of the sale or to a meeting where the sale is proposed is sufficient [to warrant forfeiture of the vehicle]." *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421, 426 (2d Cir. 1977) (emphasis added).

In this case, the Government has made a showing that the 1977 Lincoln Mark V, registered to Rudy Ford, had a substantial connection with the sale of heroin. Claimant's contention that an inference of his participation in the drug sale "by virtue of [his] presence . . . on a street corner in New York, and the fact that he was given money, the exact amount of which is unknown, by the seller of narcotics . . . is too speculative to support forfeiture of a vehicle," is not a contention which can be supported by a realistic view of the credible evidence presented here.

 The Government has proved by a preponderance of the credible evidence that it had probable cause to believe that Rudy Ford's Lincoln was used to facilitate the sale of heroin, and therefore, the Government had probable cause to institute the forfeiture proceeding. 21 U.S.C. § 881(d); 19 U.S.C. § 1615. The claimant has failed to establish that the vehicle is not subject to forfeiture. The 1977 Lincoln Mark V, Serial No. 7Y89A832686, is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(4).