**UNITED STATES of America, Plaintiff,**

**v.**

**ONE 1972 CHEVROLET CORVETTE ID NO. 1Z37K23507393, Defendant.**

**No. CA 79–1331–T.**

United States District Court,
D. Massachusetts.

Jan. 18, 1980.

---

13. Plaintiff's total salary for the 1972–73 school term was $2,601.45. However, she had received $248.63 before the discharge.

630

Bruce A. Singal, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Gerald Alch, William J. Cintolo, Boston, Mass., for defendant.

OPINION

TAURO, District Judge.

This is an in rem action brought under 21 U.S.C. § 881[1] to enforce the forfeiture of a 1972 Corvette. The Corvette's owner, Edward Simard, was indicted on two counts of conspiracy and possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2. He was tried without a jury before Judge Cannella in the United States District Court for the Southern District of New York on June 27, 1979, and was found guilty on both counts. The parties in the present action have both moved for summary judgment. They accept Judge Cannella's findings, but Simard takes issue with the government's interpretations of those findings.

I.

The evidence in the criminal action against Simard is set forth in detail in Judge Cannella's memorandum opinion.[2] The evidence established that Special Agent William T. McDonald of the Drug Enforcement Administration had, on two separate occasions, purchased 5,000 units of LSD from Anthony Serricchio. On January 29, 1979, McDonald phoned Serricchio and told him that he wished to purchase 50,000 units.

1. In relevant part, that section provides:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances possessed or distributed in violation of this subchapter].

2. *United States v. Simard*, No. 79 Cr. 278 (S.D. N.Y., August 2, 1979).

Serricchio arranged the deal with his source, James De Lorenzo. The court found that De Lorenzo was unable to make such a large purchase himself and so operated through his source, Simard. Serricchio and De Lorenzo arranged to fly from New York City to San Francisco on April 3, where they would purchase the LSD for resale to McDonald. On that same day, Simard flew from Boston to San Francisco to take part in the deal. On April 4, De Lorenzo returned to New York with the contraband. Upon his arrival at Kennedy Airport, he was arrested by federal agents.

While in custody, De Lorenzo implicated Simard in the drug conspiracy. He agreed to phone Simard from the office of an Assistant United States Attorney on April 5. During that telephone conversation, De Lorenzo told Simard that he had the "28," and informed Simard that McDonald wanted to purchase more LSD. Simard told De Lorenzo that McDonald would have to wait until the following week. On April 9, De Lorenzo arranged a meeting with Simard. De Lorenzo flew from New York to Boston on April 12, accompanied by federal agents. He met Simard at Logan Airport, and handed him an envelope containing $28,000.[3] The agents then arrested Simard.

Judge Cannella found that the $28,000 payment De Lorenzo made to Simard was reimbursement for money Simard had put up to purchase the LSD in San Francisco. Although the full purchase price of the drugs was $34,320, the court inferred that De Lorenzo kept $6,320 as a commission for his role in the transaction. Judge Cannella concluded "that Simard did unlawfully, wilfully, and knowingly agree to assist and to effectuate De Lorenzo's acquisition of large amounts of LSD for the purpose of sale to Serricchio and ultimately McDonald." *United States v. Simard, supra,* at 21. Simard was, therefore, guilty of conspiracy. The court further found that Simard was guilty of possession of 152,000 units of LSD on April 4, 1979. Judge Cannella based this conclusion on the fact that, of all the conspirators, only Simard was capable of arranging large scale transactions. Also, Simard had at least a $28,000 interest in the LSD. Finally, the court found that Simard controlled De Lorenzo's actions. Simard was, therefore, guilty of constructive possession of at least a sizable portion of the contraband.

## II.

The government has instituted the present action to enforce the forfeiture of Simard's automobile. The parties do not dispute that Simard used the vehicle to drive to Logan Airport for his April 12 meeting with De Lorenzo. What is in dispute is whether Simard's use of the automobile to meet De Lorenzo and to obtain the $28,000 is sufficient to maintain a forfeiture action under 21 U.S.C. § 881. There being no genuine issue as to any material fact, this dispute is essentially one of law, and summary judgment is appropriate.

The governing statute, 21 U.S.C. § 881(a)(4), would permit forfeiture if the subject Corvette was "used, or . . . intended for use, . . . in any manner to facilitate the transportation, sale, receipt, possession, or concealment of" controlled substances. The government contends that the sale of LSD was an ongoing multi-faceted transaction, of which Simard's agreement to front money, and De Lorenzo's implied agreement to repay it, were integral parts. Without those agreements, the government contends the sale could not have occurred. Similarly, the government argues that the car was intended to be used to facilitate possession of the LSD. It reasons that, by receiving $28,000 from De Lorenzo, Simard intended to relinquish his interest in the LSD, thereby transferring constructive possession.

Simard takes issue with the government's analysis. First, he argues that the use of the vehicle on April 12 could not have facilitated the sale of LSD in light of Judge

---

3. Judge Cannella stated that De Lorenzo gave Simard 380 $100 bills, but in the rest of his opinion he refers to the sum as $28,000. The parties also operate on the premise that the amount was $28,000.

Cannella's finding that the drug conspiracy ended upon De Lorenzo's arrest on April 4. He also contends that there is no basis in Judge Cannella's opinion for assuming that the intended sale of the drugs to McDonald could not have been consummated without the payment of money from De Lorenzo to Simard. Finally, Simard claims that Judge Cannella's finding that the conspiracy terminated on April 4 precludes a finding of constructive possession by Simard on April 12. As far as Simard was concerned, De Lorenzo had already transferred possession of the drugs to McDonald.[4]

The government cites several cases to support its argument "that use of a vehicle to transport a participant to a location at which a significant aspect of a drug purchase (or other illegal activity) occurs subjects the vehicle to forfeiture, even though the event itself does not occur in the car and the drugs never physically enter it." *United States v. One 1974 Cadillac Eldorado Sedan*, 548 F.2d 421 (2d Cir. 1977); *United States v. One 1977 Lincoln Mark V*, 453 F.Supp. 1388 (S.D.N.Y.1978); *United States v. One 1973 Volvo*, 377 F.Supp. 810 (W.D. Tex.1974); *United States v. One 1951 Oldsmobile Sedan*, 129 F.Supp. 321 (E.D.Pa. 1955); *United States v. One Dodge Coupe*, 43 F.Supp. 60 (S.D.N.Y.1942); *United States v. One 1975 Mercury Monarch*, 423 F.Supp. 1026 (S.D.N.Y.1976); *United States v. One 1945 Douglas (C–54–DC–4) Aircraft*, 461 F.Supp. 324 (W.D.Mo.1978). Simard points out correctly that in none of those cases was a vehicle forfeited which was used only after government agents had intervened and aborted the underlying drug transaction. But, such a factual distinction does not necessarily dilute the teaching of those cases in terms of persuasive, as op-

posed to controlling, precedent. Their holdings certainly do not preclude a determination that this Corvette is subject to forfeiture. Rather, this court must examine the language and purpose of the forfeiture statute to determine its applicability to the facts and circumstances underlying this seizure.

■ The language of 21 U.S.C. § 881 is undeniably broad. A vehicle need not be used to facilitate a drug transaction to be subject to forfeiture. It is sufficient that the vehicle is "intended" for such use. It is reasonable to infer that Congress included mere "intent" as a pivotal factor permitting forfeiture in order not to discourage government agents' intervention prior to the completion of a drug transaction. If forfeiture were allowed only after the vehicle had actually been used for facilitation of the drug deal, the government in many instances would have to choose between aborting the drug transaction and losing the car, or allowing the transaction to go through in the hope of obtaining forfeiture as a bonus to the desired drug conviction.

■ What is clear from the statutory language and the case law is that a drug transaction need not have been completed for the forfeiture statute to be triggered. *See, e. g., One 1945 Douglas Aircraft, supra*. All the statute requires is an intent that the car be used for the illicit purpose. The impossibility of the underlying crime, whether or not brought about by the intervention of government agents, is no defense. *See One Dodge Coupe, supra*, at 62 (allowing forfeiture where car "was an instrumentality in a prearranged scheme of transportation which was not completed by reason of the intervention of the narcotic agents").

4. Simard also challenges the conclusion that he fronted money for the purchase of narcotics. He argues that, since the "purchase price" of the LSD was $34,320, Simard, by accepting $28,000 from De Lorenzo, was taking a loss. Since no drug dealer can be assumed to intend such a loss, Simard argues, it is unreasonable to assume that he fronted the money. The government, on the other hand, appears to assume from Judge Cannella's opinion that Simard fronted $28,000, and therefore broke even

on the deal. It is reasonable, however, to read Judge Cannella's opinion to mean that the purchase price of $34,320 was the price to McDonald, not the cost of the LSD to the conspirators. Thus, the $28,000 may have represented a substantial profit to Simard. Since the government relies on Judge Cannella's finding that Simard did front money for the deal, and Simard has submitted no affidavits to contradict that finding, there is no genuine issue as to Simard's role in the transaction.

Significant as well is that the statute permits forfeiture of a vehicle used "in any manner" to facilitate a drug deal. It is difficult to conceive a broader mandate. The use of that phrase in this 1970 statute, and its absence from an earlier forfeiture provision, "patently indicates the congressional intent to broaden the applicability of the forfeiture remedy it provided." *One 1974 Cadillac Eldorado, supra,* at 425. Thus, it is clear that Congress envisioned a forfeiture net of sufficient breadth to ensnare any vehicle whose use had some nexus to illicit drug trafficking. Congress saw this forfeiture provision as an economic penalty against those even on the periphery of a drug transaction, as well as a general and specific deterrent of direct or indirect involvement. In short, the Congress wanted to impose higher risk on what is clearly high yield criminal activity.

In the case at hand, Simard's use of his Corvette to drive to Logan Airport on April 12 was intended in some manner to facilitate the sale of contraband. Simard's fronting of money to purchase the LSD in San Francisco was an integral part of that operation, even if this court were to accept his argument that the money was not essential to the transaction. The $28,000 Simard intended to receive when he drove to the airport was in some manner linked to illegal drug trafficking. He felt entitled to the money. He expected it. The conversation he had on April 5 when the "28" was mentioned was laced with talk about the sale of drugs. Four days later, the meeting at Logan was set up. That meeting was, therefore, "an integral part of the drug selling conspiracy." *One 1974 Cadillac Eldorado, supra,* at 423. His intended use of the vehicle to attend that nefarious meeting was a sufficient nexus to drug trafficking so as to warrant imposition of the forfeiture penalty. As with the car owner in *Eldorado,* Simard was "hardly a babe in the woods." *Id.* at 424. Rather, Simard knowingly involved himself with what he hoped, expected and intended would be a successful drug transaction. He, therefore, assumed the risk not only of his narcotics conviction, but also of the forfeiture of his car.

Nor does the government's termination of the conspiracy, through the April 4 arrest of De Lorenzo, save the day for Simard. He intended to attend a meeting concerned with drug dealing. The fact that the government's intervention made De Lorenzo's participation impossible is irrelevant. To give Simard the benefit of De Lorenzo's arrest would be to punish the government for its own efficiency, and would be clearly contrary to the Congressional purpose underlying the forfeiture provision.

Simard cites two cases that have refused forfeiture where the car neither contained the drugs nor was used as a place of negotiation. *United States v. One 1972 Datsun,* 378 F.Supp. 1200 (D.N.H.1974); *United States v. One 1970 Buick Riviera,* 374 F.Supp. 277 (D.Minn.1973). Although the reasoning of these cases may well apply where more narrowly drafted forfeiture statutes are involved, such as in *Simpson v. United States,* 272 F.2d 229 (9th Cir. 1959) (relied upon in *Datsun, supra*), this court declines to apply it to the liberal forfeiture provision of 21 U.S.C. § 881. *See One 1974 Cadillac Eldorado, supra; One 1945 Douglas Aircraft, supra.*

For the above reasons, the government's motion for summary judgment is allowed.

An order will issue.